SAM MASSEY v. THE STATE.

*No. 35.  Decided December 17.*

**1. Rape—Admissibility of Evidence of Threats to Commit.**—On a trial for rape, where it was shown by the testimony that on the day before the rape was alleged to have been committed, the defendant, in connection with remarks made by him of a most obscene and vulgar character, had said that he "intended to have some skin that night, if he had to kill some of the damned girls" (not naming any girls), and which evidence was objected to, because irrelevant and immaterial. *held*, that the objection was not maintainable, and that the evidence was competent.  The intended victim need not be named, if subsequent facts show, with reasonable probability, to whom reference was made, or the threat was such as to evidence a determination to ravish some female that night.

**2.  Admission of Immaterial Evidence not Reversible Error.**—Admission of immaterial evidence, which in the light of other evidence and circumstances of the case had no criminative force, and was not injurious to the accused, will not constitute reversible error.

**3.  Attempt to Rape — Charge of Court.**—Where on a trial for rape the court, in its charge to the jury, made the fact of defendant's guilt to depend upon their belief. beyond reasonable doubt, that he had actually ravished and penetrated the injured female, *held*, that defendant could not be heard to complain that the court had omitted to charge the law with regard to an attempt to commit rape.

**4.  New Trial—Mob Violence.**—See a state of facts, set out in extenso in the opinion. upon which it was *held*, that appellant was entitled to a new trial, because he was deprived of a fair and impartial trial on account of the presence. conduct, and threats of a mob.

APPEAL from the District Court of Grayson.  Tried below before Hon. P. B. MUSE.

Appellant was tried in the court below, and was convicted of rape, alleged in the indictment to have been committed by him upon one Elizabeth Smith, on the 29th of February, 1892.

Douglas Lamb testified:  That on the day of and before the commission of the alleged offense, he saw defendant and another negro in a wagon, driving rapidly from in the direction of Denison; that they stopped, and he went up to see who it was.  They had a jug of whisky, and while they were drinking Mr. Smith drove up and drank with them. That defendant, in relation to some remark about a jack belonging to witness, used some very obscene and vulgar language (which it is unnecessary to repeat), and said that he intended to have some skin that night if he had to kill some of the damned girls.

Mrs. Elizabeth Smith testified, substantially:  Know Sam Massey, the negro on trial.  (Points him out.)  Will not swear positively that that is him, for I never saw him but that one night.  It looks like him, and I believe it is he.  On the night we were hurt, a little after dark, my hus-

band came home. Sam Massey came with him. He helped me take my husband into the house, and then went out and helped my oldest boy to put up the horses. When he returned to the house he asked for a cup of coffee, and told me to give Mr. Smith one. I gave a cup of coffee to each of them. My husband was lying on a pallet by the stove, and occasionally would say something about going home, when Sam would say, "You are all right; Sam is here with you."

Sam kept staying on, and I felt afraid of him. He looked mean out of his eyes. He asked for a drink of water, and I got it for him. He asked how far off it was to neighbors. I told him it was not far. He asked who were the closest. Told him that some lived near, in Fitch's pasture. He replied that no one lived there; that he knew that house. He asked if I was not afraid to be so far from neighbors. I told him, no. Mr. Smith began moving, and Sam said, "Let's get him to bed." At this time my oldest boy (9 years old) was asleep in bed; my next little boy was up with me. There was a bois d'arc stick about as big as my arm lying by the stove. Sam picked that up, and as I helped Mr. Smith to the bed, just as we got there, he, the defendant, struck Mr. Smith with the club, and he fell on the bed. He struck Mr. Smith three times, cutting his head, and leaving him insensible. I tried to ward off the blows, and got my left hand hurt. My little boy was by my side, and Sam struck him. I tried to shield the boy's head, and got struck on my other hand. The little boy fell bleeding and senseless; and Sam then struck me on the head, and I knew nothing more for several days. I know, from the cuts and bruises, that I was struck three times on the head, and once on the bosom after I was insensible. Am deaf now; can hear nothing. Could hear before I was struck. Never consented to have intercourse with Sam at any time, and he never asked me to have intercourse with him. Never had intercourse with any other man than my husband. If Sam Massey was drunk I did not know it. Nothing was taken from the house that night, so far as I know. On the night of this assault no one was at the house except my husband J. W. Smith, the two little boys, the baby, and myself.

Crip Smith testified: Know the defendant. (Points him out.) He came home with pap the night we were hurt. Helped mother take pap into the house, and then came out and helped me put up the horses. He then went into the house, and mother gave him some coffee. I went to bed and to sleep. Waked up, and mother was wrestling with Sam. He struck her over the head three times, and she fell to the floor. I jumped up, and Sam came at me and struck me on the head. It seemed to make me sleepy. Afterward I sorter waked up and saw Sam Massey take the lamp, which was full of oil, and throw it into the stove. He then left the house. My mother lay just where she fell, and her clothes were down. I am 9 years old. Staid in the house all the rest of the night,

and baby waked up three times in the night and I put it to sleep. Some-time during the night mother got up and laid down on the bed. Pap nor my brother never moved all night.

J. W. Smith testified: Was drunk when I got home on the night of the 29th of February. Did not see the first blow that struck me, but saw Sam Massey strike the second blow, and knew nothing more for several days. I have not had the gonorrhœa for eighteen years.

Mary E. Smith, daughter of J. W. and Elizabeth Smith, 12 years old, had stayed at her grandfather's the night of the 29th of February. Re-turned home the next morning about 10 o'clock. Found her father and mother lying on the bed, all bloody and insensible, and her brothers Crip and Flese (7 years old), both had wounds on their heads, which were bloody and swollen.

Mrs. S. H. Smith: Am a sister to Elizabeth Smith. She was hurt on Monday night, and witness got there on Wednesday night, and nursed her some weeks. As soon as she got there, made an examination of the person of her sister, and found scratches and bruises on the inside of her legs near her private parts. A few days afterwards her sister passed a little blood from the womb, and a slight discharge of some kind.

Minnie Sumner (colored testified): Live two or three miles from Mr. Smith's. On the evening before the assault on Smith's family, defend-ant and George Sumner came to my house, and about half an hour later Mr. Smith came. He was drunk, and I told defendant to go home with him, and saw them start off. About 4 or 5 o'clock the next morning de-fendant returned; said he had been lost and was wandering around. He laid down on the floor and went to sleep. At breakfast, I noticed blood upon the sleeve of his coat and upon his cap.

Dr. A. F. Wright: Was called to see the Smith family on the after-noon after they were hurt. (Describes the wounds that he found on the various persons of the family.) Examined Mrs. Smith specially to see if there had been penetration. Saw no sign of it. She being a married woman, and having borne children, it would be more difficult to say cer-tainly whether there had been penetration than it would in the case of a young girl. Think that she was about three weeks gone with child, and abortion took place a few days after. The blows she received and the nervous shock were sufficient to produce abortion. Noticed the discharge from the parts after a few days, and suspected gonorrhœa. It might have been lucorrhœa. Noticed a bruise on the inside of Mrs. Smith's left thigh. There was no blood on her clothing below the waist.

Doctors Michael and Sadler, physicians, and partners, were called to see Mrs. Smith the day after her hurt, and were still treating her at the time of the trial. Treating her for gonorrhœa, and have been for six weeks. Discharge does not yield to treatment. Symptoms might pro-ceed from abortion. Discharge may be lucorrhœa, but think it is gon-

orrhœa.  Noticed scratches and bruises on the legs, on the inside, and also bloody smears, as though blood had been rubbed off, which did not come from the bruises and scratches.

George Sumner, colored, said:  Last fall I saw defendant with some yellow medicine in a bottle, just like some witness had used when he had the clap.  Asked him what it was for, and he said that he had the clap. Noticed blood upon defendant's clothes the morning he came to my mother's.  Asked him about it, and he avoided the question, and went home and changed his clothes.

R. L. McAfee, sheriff of Grayson County, testified to having gone to the defendant's cabin the night before, and finding in his valise there, and took from it, a small glass syringe (which he produced in court). Arrested defendant the day after the assault.  He was plowing in the field.  Found his cap at his house; it had been recently washed.  Got his coat, with blood on the sleeve, from Millie Sumner.

Defendant, waiving personal privilege, offered to submit himself to medical examination, and the court appointed Drs. Michael and Sadler and Dr. T. A. Freeman, who had not been in any way connected with the case theretofore.  After examination, and upon their return, they testified that they had found no signs of gonorrhœa; there was no stricture, except that when the instrument, which they called "the sound," and which had been introduced by them, was withdrawn it had a particle of matter on the end which might be gonorrhœal or might be semen. Drs. Michael and Sadler thought that it was gonorrhœal matter.

All these witnesses testified that the syringe produced by the sheriff was an instrument used in cases of gonorrhœa, and that by its color it showed that bluestone had been used in it, and that bluestone is injected for gonorrhœa.

The matters pertaining to the threats and demonstrations of mob violence mentioned in the defendant's motion for new trial are fully set forth in the opinion.

No brief for appellant has come to the hands of the Reporter.

*R. H. Harrison*, Assistant Attorney-General, for the State.

HURT, Presiding Judge.—Appellant was convicted of rape, and his punishment assessed at death, from which judgment he appeals.

Appellant alleges in his motion for a new trial the following errors:

1. The verdict of the jury is contrary to the evidence in this, that the evidence fails to show beyond a reasonable doubt, or to show at all, the fact of penetration.

2. The error of the court in admitting the evidence of Douglas Lamb as to remarks made by defendant on the day before the offense is alleged

to have been committed, to the effect that he intended "to have some skin that night if he had to kill the girls," the same being irrelevant and incompetent to prove any issue in this case.

3. The error of the court in allowing Sheriff McAfee to testify that he had on the last day of the trial found a syringe, such as is used in cases of gonorrhœa, in the house that this defendant lived in when he was arrested last February, the said house having since been open to any one desiring to enter.

4. The error of the court in refusing defendant's request to charge the jury as follows: "If from the evidence in this case the jury believe that the offense of rape as charged in the indictment was not committed, but was attempted by the use of the means of force to be committed upon the person of Elizabeth Smith, then the jury may find the defendant guilty of an attempt to commit rape, and affix the punishment at not less than two nor more than seven years confinement in the penitentiary."

5. Defendant did not get a fair and impartial trial, for the following reasons, to-wit:

From the very day the defendant was first arrested, charged with the rape of Elizabeth Smith, the prejudice in Grayson County has been so very great continuously up to this time against the defendant, that he has been wholly unable to obtain a fair and impartial trial. That at the time of his arrest a mob began forming for the avowed purpose of murdering this defendant, and defendant's life was only saved by the sheriff's conduct in privately and secretly removing this defendant from the jail in Grayson County, and conveying him to the jail in Fort Worth; that immediately after this secret removal, made in the first shades of darkness, the mob, as aforesaid, surrounded the jail, and were only prevented from attacking it by the act of the officer, who allowed a committee from the mob to search the said jail. That the people of Grayson County have threatened to hang this defendant, and still say they will hang him, regardless of law, if he is not hung by the law in Grayson County, Texas. That certain of the people of Grayson County have organized, and did organize, before the trial of this case, and agreed between themselves, that if a change of venue was granted the defendant in this case, they would hang him before he left the court house; or if this case was continued they would hang him at once; or if he was cleared by the jury, or allowed a punishment less than death, they would at once hang him. That at all times when this defendant was brought from the jail to the court house, said mob was there, ready, willing, and determined to execute their threats.

That on the day fixed for trial the State's witnesses were not present at the opening of the court, and the case was continued until after dinner; that before that time arrived, the injured woman, Elizabeth Smith, arrived, and without the knowledge of the county attorney, and against

his will, was placed in a prominent position on the street, where her presence, and stay, and appearance might the more wildly inflame the passion of the mob which gathered around her, so that, by the opening of court, it was deemed imprudent to bring this defendant out of jail. The county attorney, himself, advised the defendant's counsel that the case, on some pretext, should go over until the next day, so that the excited throng might disperse and have time to cool. The case was then, upon motion of defendant's counsel, continued until the next morning, on the ground of the absence of one of the counsel appointed by the court to defend, the absent counsel being an old resident of the county, and the two present being new-comers in the county, unacquainted with the jurors and people of the county. That, upon the announcement of this continuance, the excited mob began moving by hundreds towards the jail, threatening to break it and hang this defendant; that while expressing these threats, and collecting arms, sledge hammers, and tools to destroy the jail, prominent and influential citizens tried to make speeches, counselling moderation and obedience to the law, but they were hooted down, and the life of defendant only saved by the determined attitude of the sheriff and his force of armed men occupying the jail; the sheriff firmly warning the mob that he would shoot the first man who touched the jail door, and that he would sacrifice his life if necessary in the performance of his duty of protecting defendant.

That the honorable district judge who tried the case had full knowledge of all the foregoing facts, and that while the mob was raging around the jail, one of defendant's attorneys, appointed by the court to defend him, applied in person to the court, and asked him of his own motion to change the venue, as defendant could in no event obtain a fair trial in Grayson County, which the court refused to do, for the reason that it would at once precipitate an attack upon the jail, which he desired to avoid. Defendant was hampered in his surroundings in the choice of a jury, and accepted some who were disqualified by reason of having formed an opinion, for the reason that he believed he was bound to have a jury and try the case or be hanged by a mob. That the prejudice was and is so great that the members of the bar refused to defend, and the court had to require the counsel who finally defended the case to do so after they had more than once asked to be released from the duty.

That while the jury were out considering of their verdict, the honorable district judge who tried this case advised defendant's counsel to have defendant waive his right to be present at the reading of the verdict, as under all circumstances it was best to have him safely in jail. The county attorney then wrote such a waiver, which the defendant's attorney brought to the jail, and defendant signed. Defendant is informed, and believes, that when the verdict of the jury finding the defendant guilty, and assessing his punishment at death, was read, a wild yell of applause went

up from the crowd in the court room, which was at once silenced by the court and officers, but was heard outside, and was re-echoed around the square by thousands.    Defendant further says, that the reason he did not file his motion for a new trial within two days after the verdict, and not before this time, is because defendant believed if he took any steps towards an appeal, that the mob would at once storm the jail and hang this defendant; and defendant's counsel refused to file any such motion while defendant remained in Grayson County jail; and that since defendant has been removed, defendant's counsel has been continuously absent from the said State of Texas, until this day, June 1, 1892.   Wherefore defendant prays that this motion be entertained by the court, and the verdict of the jury and judgment thereon set aside, and a new trial granted this defendant.

This motion was properly sworn to, and the prosecution introduced the following controverting affidavits:

Y. S. Creager says: That he is now, and has been during this year, deputy sheriff of Grayson County, Texas.   That he was in Sherman, and about the court house and jail on April 20, 1892, the day Massey's case was set for trial; that during the first half of that day there was no commotion or disorder of any consequence; that soon after noon of April 20, 1892, and about 2 o'clock, a body of men went from the court house to the jail, and it was understood they wanted Massey, and they so said to one another; that in my opinion about 30 men in this body were interested as a mob and about 300 were present as spectators, and they remained there for about something over an hour; that during the time they were at said jail said mob never made any demand for Massey or anybody that had charge of him; never made any efforts to enter the jail where Massey, the sheriff, and posse were, though one of said mob had a sledge hammer and another a crowbar; nor did any of said mob ever, by turning a latch or by any other act, try to gain admission to said jail, nor did said mob inflict or attempt to inflict any violence upon said sheriff, or any of his posse in charge of said jail and said Massey.   That it is true that when said body of men or mob were at the jail that Sheriff McAfee told them that he did not want to hurt any of them, but that Massey was his prisoner, that it was his duty to protect him, and that he was going to do his duty if it cost him his life.   That it is true that said mob showed by their acts and utterances that they had no regard for law, and some good citizens may have been acting with them, but the majority of those that this affiant saw and heard make violent talk were beardless boys and drunken men, in whom there was little if any harm.

That this affiant stayed at the jail all night on the night of April 20, and that there was no mob or act or demonstration of lawlessness at said jail, nor was there anything of the kind heard of in Sherman by this affiant, nor was there anything of the kind that affiant heard of on the

ensuing day when said Massey's trial commenced, nor during said trial. That during the making up of the jury, and in fact from the time Sam Massey entered the court room, on the morning of April 21, 1892, at 8:30 a. m., until about 5 p. m., on April 22, 1892, when the verdict in his case was returned, although the court room was filled to its seating capacity by interested spectators and others, there was not the slightest disturbance; and although this affiant has been much about the court room for twenty years, he has never seen better order preserved than was preserved during the entire trial of Massey. That in selecting the jury to try said Massey his counsel peremptorily challenged some jurors, but said counsel had not exhausted the peremptory challenges allowed defendant by law when his jury was made up. That two of said jury are life-long republicans, and all of said jurors are men who would accord to a negro as fair a trial as to a white man. That this affiant never saw a more intelligent jury nor a jury of higher moral standard than the jury that tried said Massey, and he has never seen as good a jury in a capital case.

That this affiant was with said jury all the time from the time they were empanelled until they retired to make up their verdict; that nobody ever spoke to them or in their presence from the time they were empanelled until their verdict was made, except in the court room during the trial, except affiant, he being in charge of them. And if there was any combination to hang said Massey in case the said jury failed to convict him and assess his punishment at death, this affiant says that this jury could not have in any way been influenced by it, for they could not have known of such combination. If there was anything to influence the jury to find the verdict they did except the law and the evidence in the case, this affiant knows nothing of it, and he says he was with them until they were locked in their room to make their verdict. That this affiant believes that notwithstanding the demonstration heretofore mentioned, that this defendant had a fair and impartial trial, and although a part of his counsel asked to be excused from the disagreeable duty of defending a man charged with rape, still he was ably defended. That it is true that some feeling existed in the immediate neighborhood of where the crime with which said Massey is charged was perpetrated, and feelings existed against said Massey in other portions of Grayson County; but Grayson County is a large county, containing 60,000 people, and the great bulk of the people in said county knew little of and felt no special interest in said cause of said Massey.

Eugene R. Andrews makes affidavit as follows: "I was present in Sherman about the jail on the 20th, 21st, and 22d of April, A. D. 1892, and am cognizant of all the facts set forth in the affidavit of S. Y. Creager, except that I did not have charge of the jury, and don't know what said jury saw and heard; and I state that the other facts are true; and further, that after 6 p. m., April 20, 1892, all excitement and evidence

of lawlessness and of a mob had disappeared, and did not reappear during said Massey's trial. That he went to and from the jail with Massey during the trial, and no violence was offered him, and no demonstration was made by any mob.''

W. S. Dickerman, on oath, states: '' I was a member of the jury that tried Sam Massey. If there was any combination of men formed for the purpose of hanging Sam Massey, in case the jury failed to assess the death penalty, I never knew it, nor did I hear of such a thing until after the jury had returned their verdict. If anybody tried in any way to affect said jury in finding their verdict by any outside influence, I never knew or heard of it. After said Massey's case was given to the jury, we discussed in the jury room all the evidence in the case, and reread the charge of the court, and after deliberating nearly two hours, we reached the conclusion that defendant was guilty of rape, because that was the only just and reasonable conclusion we could reach under the law, and assessed the death penalty as the only adequate and just penalty that we thought we could fix.

''We considered the question submitted to us a very serious one. We talked about and considered it coolly and deliberately, and I think not a single impassioned remark was uttered in the jury room. I know that some people were making some demonstrations in the evening of the 20'th of April, but from the night of April 20 afterwards I thought that the excitement and disturbance had subsided. I think Sam Massey had a fair and impartial trial, and that the verdict in his case was just.''

We will not notice the grounds for new trial in the order presented in the motion, but will present the questions as they arose on the trial, except those which were upon the affidavits of appellant setting forth the facts relating to the mob and its influence, or probable influence, upon the trial of his legal rights.

The testimony of Douglas Lamb was competent. The intended victim need not be named if the subsequent facts show with reasonable probability to whom he referred, or the threat was such as to evidence a determination to rape some female, not a particular one, that night.

McAfee's testimony in regard to finding the syringe at a house once occupied by defendant, when viewed in the light of the other evidence, had no criminative force, and was not, under the circumstances of this case, injurious to appellant.

The fourth assignment, namely, that the court refused to submit a charge to the jury regarding an attempt to rape, is not supported by the record. The record does not contain a requested charge upon any matter whatever, nor an exception to any omission in the charge of the court. However, was the omission, when the whole charge is considered in connection with the evidence, calculated to injure the rights of the appellant? The court gave to the jury this charge: '' To constitute the of-

fense of rape, it must be proven beyond reasonable doubt that the defendant with his male member penetrated into the female organ of the woman charged to have been ravished; but it is not necessary to prove an emission occurred.   In this connection, you are informed that if you believe that defendant assaulted by force the woman named in the indictment as Elizabeth Smith, and without her consent, then in order for you to arrive at a conclusion from circumstantial evidence that defendant with his male member penetrated into the female organ of said Elizabeth Smith, each fact necessary to the conclusion sought to be established must be proven by legal evidence introduced on the trial, to your satisfaction beyond a reasonable doubt.   All the facts (that is, necessary facts to the conclusion) must be consistent with each other and with the main fact to be proved; and all the facts and circumstances taken together must be of a conclusive nature, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused did with his male member penetrate into the female organ of the woman charged in the indictment to have been ravished."

This charge required the jury, in order to convict, to find from the evidence beyond a reasonable doubt that defendant penetrated the prosecutrix.   This the jury must have found, or believed beyond a reasonable doubt, or they disobeyed the very plain instructions of the court.

Fifth assignment: Was appellant deprived of a fair and impartial trial by the presence of the mob? To this it may be replied, that he should have applied for a change of venue.   Appellant's answer to this is, that certain of the people of Grayson County had organized and agreed among themselves, that if a change of venue was granted to defendant in this cause, they would hang him before he left the court house; that the judge had full knowledge of all the acts and doings of the mob, and that while it was surging around the jail one of the defendant's attorneys, appointed by the court, applied in person to the court and asked him of his own motion to change the venue, as the defendant could in no event obtain a fair trial in Grayson County; that the court refused to do so, *for the reason " that it would at once precipitate an attack upon the jail, which he desired to avoid."*

Were these facts true? The appellant swears they were.  He also swears that the judge who tried the case knew them all, and gave as a reason for not changing the venue, that to do so would at once precipitate an attack upon the jail, which he desired to prevent.   When the application for a new trial was presented to the judge, containing these matters, he knew they were true, or he knew they were false; he, however, makes no denial or explanation whatever; we must therefore presume them to be true.   Such a state of affairs existing, if true, the court being environed and dominated by such a mob, breathing out such threats

to the life of appellant, it is solemn mockery to talk, think, or imagine a fair trial under such conditions. Appellant was not required to apply for a change of venue, when, if granted, his life would be forfeited—the price. To hold that a trial under such circumstances was fair, impartial, and legal, would be a travesty on decency, law, common sense, and justice, notwithstanding good men may have tried appellant.

Appellant was not present when the verdict was reached and returned into court. But the State replies, that he waived this right. He did, but under what circumstances was this so-called waiver made? "While the jury were out considering of their verdict, the honorable district judge who tried the case advised defendant's counsel to have defendant waive his right to be present at the reading of the verdict, as under the circumstances it was best to have him safely in jail. The county attorney then wrote out a waiver, which defendant's attorney brought to the jail, and defendant signed it." Neither the honorable judge nor the county attorney denies these things, nor is there any explanation of this matter. Why was it best to have defendant safely in jail? What were the circumstances which rendered it best to have him safely in jail? The answer to these questions is evident. The spirit, if not the presence, of that same howling, threatening, tumultuous, blood-thirsty mob had overawed justice, dominated the court, and this deprived the appellant of the right to be present in court when the issue of his life or death was being settled. Did the appellant waive his right to be present when the jury returned their verdict? He did not. This so-called waiver was forced upon him; he was compelled to make it, or take the risk of being hung by the mob in the event the jury failed to hang him. It would be an insult to law, justice, and common sense to submit an argument or cite authorities to prove that the act of appellant called a waiver was not such as would be binding upon him.

Appellant had a right to a fair and impartial trial, which was denied him by a mob. He had a right to be present in court. It was his court, the court of every citizen of this State; its portals must be kept open, and no mob has a right to close them against a citizen who is being tried for his life, liberty, or property. He was deprived of this right by a mob, and not by the court, for the writer is impressed by this record with the belief that the ruling of the court in regard to the change of venue and motion for a new trial was made to save defendant from the vengeance of the mob.

But it is contended that the mob, when the verdict was returned, had dispersed; that in fact there was no danger to appellant. The honorable judge did not so view the situation, or he would not have requested the waiver. The sheriff did not think so, or he would not have removed defendant from the Grayson County jail.

But it may be contended that the appellant, notwithstanding all these facts, had a fair trial. See Craiger, Andrews, and Dickerman affidavits. That the jury was composed of the very best men, and, so far as Dickerman knows, passed upon the case in a proper spirit, without being influenced by extraneous or improper matter. No one denies that the mob was present; that its members agreed among themselves that if a change of venue or continuance was had, or if appellant was acquitted, or was not hung by the verdict of the jury, they would at once hang him; nor is it denied that the judge requested the waiver because he thought under the circumstances it would be best to have appellant safely in jail.

Must appellant under such state of facts go with his evidence into the jury room and show that the jury was influenced by the mob, or will the State be permitted to show by jurymen that they were not so influenced? If so, our statutes on the subject of changing the venue are nonsense, sheer foolishness; we can not prove its effects by positive evidence; its spirit pervades the surrounding atmosphere, and dominates the court and jury without their knowledge.

Appellant has not had a fair and impartial trial; he has not had a legal trial. But it may be urged that he is guilty beyond all question, and therefore the judgment should be affirmed. Not so. "The accused must be tried and convicted legally; and though he be a negro, he must be tried in precisely the same manner as if he were a white man; and we can not strain the law, even in the estimate of a hair, because appellant is a negro, or because of any unusual features of this case. In all civilized countries the law has always shown the most sacred regard for human life, and judicial tribunals in the administration of the criminal law have always deemed it proper to adhere with great strictness to established rules, where life and liberty are concerned. If courts could feel themselves at liberty to depart from principle or established rules in order to hasten the punishment of even great offenders, such departures might result in the destruction of those safeguards which, in accordance with the genius of all free governments, have been provided for the life and liberty of men." Calvin, a slave, v. The State, 25 Texas, 789.

In the case of Shylock v. Antonio, the Merchant of Venice, Bassanio, a great friend of Antonio, urged Portia, the judge, to "Wrest once the law to your authority; to do a great right, do a little wrong, and curb this cruel devil of his will." Portia's answer was law—the correct principle. She replied: "It must not be; there is no power in Venice can alter a decree established. 'Twill be recorded for a precedent, and many an error by the same example will rush into the State. It can not be."

This court can not make nor alter the law. The rules and principles announced in this case will be recorded for a precedent for all cases involving the same questions. Hence there must of necessity be a fair and

impartial trial to all, with all legal rights awarded, though the accused be reeking with guilt.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.