## ED FAULKNER v. THE STATE.

### No. 4147. Decided November 29, 1916.

**1.—Rape—Conduct of District Attorney—Bills of Exception—Improper Questions.**

Where, upon appeal from a conviction of rape upon a female under the age of consent, some of the bills of exception showed that the appellant's attorney during the trial in the court below learned that certain questions would be asked certain witnesses for the defense by the State to impeach them, which questions by the district attorney were clearly illegal and improper and known to be so by him at the time and before they were asked, and defendant's attorneys in- formed the trial judge and besought him to instruct and require the State's attorneys not to ask them, but the court refused to do this and the State's attorneys did ask the said witnesses such questions during the trial, the same was reversible error. Following Vick v. State, 71 Texas Crim. Rep., 50, and other cases.

**2.—Same—Mob Violence—Fair Trial—Practice in District Court—By- standers.**

See opinion, where Davidson, Judge, holds that the defendant did not receive a fair trial under the law and the evidence by an impartial jury, but that the latter acted under the intimidation of a mob or mob spirit pervading the court- room during the trial of the defendant, and that the trial judge was also swayed thereby, and that the judgment should be reversed and the cause remanded for a new trial on account of this influence. Prendergast, Presiding Judge, holding that, in as much as the motion for new trial setting forth these allegations, al- though sworn to as a pleading, did not prove this of itself, and as the record showed that the trial judge heard evidence thereon and overruled the motion, which evidence is not disclosed in the record, the same was not reversible error. Harper, Judge, absent.

**3.—Same—Charge of Court—Practice in District Court—Negative Charge.**

The trial judges are reminded of their duty to charge the law of the case, and wherever the question is favorable to the defendant to give an affirmative charge calling the attention of the jury to the law, that a negative charge pre- senting the defendant's side of the case, frequently leads to the reversal of the judgment in this court.

Appeal from the District Court of Smith. Tried below before the Hon. R. M. Smith.

Appeal from a conviction of rape; penalty, imprisonment in the peni- tentiary for life.

The opinion states the case.

*Simpson, Lasseter & Gentry* and *J. M. Edwards*, for appellant.—

Improper cross-examination of witnesses: Shed v. State, 153 S. W. Rep., 125; Wyatt v. State, 124 id., 929; Hodges v. State, 73 Texas Crim. Rep., 378, 166 S. W. Rep., 512; Clements v. State, 69 Texas Crim. Rep., 369, 153 S. W. Rep., 1137; Kemper v. State, 63 Texas Crim. Rep., 1, 138 S. W. Rep., 1025; Short v. State, 79 Texas Crim. Rep., 426, 187 S. W. Rep., 955; Bullington v. State, 78 Texas Crim. Rep., 187, 180 S. W. Rep., 619; Price v. State, 43 S. W. Rep., 96; Sweeney v. State, 146 S. W. Rep., 883.

On question of mob law and conduct of bystanders: Hamilton v. State, 36 Texas Crim. Rep., 372; Manning v. State, 37 id., 180; Holt .v. State, 51 id., 15; Derry v. State, 55 id., 353; Cober v. State, 72 id., 374.

On question of insufficiency of the evidence: King v. State, 4 Texas Crim. App., 256; Roberts v. State, 64 Texas Crim. Rep., 135.

*C. C. McDonald,* Assistant Attorney General, for the State.—On ques-'tion of cross-examination of defendant's witnesses: Orner v. State, recently decided; Wright v. State, 63 Texas Crim. Rep., 429; Chance v. State, 63 id., 602; Park v. State, 57 id., 24; Hart v. State, 57 id., 21.

On question of mob violence: Stegald v. State, 22 Texas Crim. App., 464; Massey v. State, 31 Texas Crim. Rep., 371.

DAVIDSON, JUDGE.—Appellant was convicted of rape, his punishment being assessed at life imprisonment in the penitentiary.

The State's theory was that appellant committed the offense of rape upon a girl under fifteen years of age, whose name was Georgia Holloway. The identification and alibi were serious questions. Miss Holloway had never seen the defendant before the evening of the alleged rape, and the other witness identifying appellant as going along the street was vigorously attacked. The evidence for appellant by a number of witnesses is to the effect that he was at his mother's hotel in Tyler, a mile or such matter from the scene of the rape. The details of these matters are deemed unnecessary to be stated.

There were several bills of exception reserved to the action of the court permitting the prosecuting officers to ask questions laying or seeking to lay a predicate for impeachment, and to show reasons why certain testimony should not be believed. Objection was interposed and sustained by the court. The questions were of a damaging character, and indicated, if answered for the State as anticipated, they would be damaging. It usually is not necessary to restate these matters. It is sufficient for the court usually to state that the manner of examining the witnesses was damaging in its nature, without hope of being answered favorably for the State. It might be mentioned here that some of the witnesses, who were boarders at the hotel, testified to defendant's presence at the hotel, to his taking supper there, and that he was at the hotel all the time covered by the State's case and until long afterward. Some of these witnesses were asked, by way of illus-

tration, if they were paying any money for their board at this hotel. This is singled out as one of the matters of interrogation. The State's theory was the mother of defendant was boarding the witnesses free, they being his witnesses. It is made evident, as we understand the bills of exception, that the answer would have been that they were paying board, and that the mother of appellant was not furnishing them free board as a means of inducing them to commit perjury. There are quite a number of these bills, and the above is but illustrative. If the bill of exceptions as signed by the judge is to be credited, this testimony is illegitimate, being asked by the State without any anticipation of favorable reply, and the theory of the defendant was, as shown by the bill of exceptions, that they were asked in this way to impugn the motive of the witnesses and thus attack them without evidence. This is unfair and illegitimate. In this way the State evidently built up or was attempting to build up a prejudice against the witnesses for the defendant and thereby impair his standing before the jury. This is not proper, and in this case, in view of all the facts and circumstances, will be regarded as reversible error. The writer does not care to cite authorities on this character of proposition. What has been said will cover quite a number of bills of exception.

Another bill will be noticed. While the witness Steel was on the stand as a witness for defendant he stated, "That on the evening it is alleged the defendant committed the assault, between 5 and 5:30 o'clock he saw the prosecutrix walking north on the International & Great Northern Railroad at a point where Locust Street crosses said road in company with a man; that they turned across the railroad on said Locust Street in a westerly direction (this is the point where the prosecutrix testified she walked with the defendant and turned into Locust Street going west) ; that he did not know the man in company with the little girl; that he did not know Ed Faulkner; that on the morning the case was called for trial he saw the defendant for the first time and that he was not the man he saw with the little girl at the above point. On cross-examination of this witness by the State, the district attorney asked the witness the following question: 'You knew the officers were trying to find out who committed the crime, and you didn't tell any officer?' To which the witness answered, 'No, sir,' whereupon he asked, 'You didn't know enough to tell them, you mean you didn't know enough then to tell them, you just now know enough? I see, I beg your pardon, when did you find it out?' To which question the defendant objected on the ground that it was a reflection on the witness and an insinuation by the State that the witness' testimony was fabricated, and the court sustained the objection urged by the defendant." Appellant excepted for several reasons. This bill was signed by the district judge. Questions of this character and matters of this sort were reserved by quite a number of bills of exception.

It is well enough to notice another bill. While the witness Cumby was testifying for the defendant, it was shown by him that he knew

the appellant; that on the evening the assault is alleged to have been committed he went to the postoffice about 5 o'clock and was returning home between 5 and 5:30 o'clock, walking east along Locust Street in front of the fire station, which is located on the north side of Locust Street; that he saw a little girl in company with a man who was carrying a tin bucket or oil can in his hand; that he did not notice what it was; that they walked diagonally across Locust Street at the intersection of College and Locust Streets; that he was and is well acquainted with Ed Faulkner, the defendant, and that Faulkner was not the man with the little girl whom he saw on the above occasion; that he went on in the direction of his home and passed by Mrs. Faulkner's, the mother of defendant, and saw the defendant, Ed Faulkner, in the back yard cutting wood; that he did not know the little girl at the time, but some time after meeting them on the occasion aforesaid he saw the prosecutrix in this case and recognized her as the little girl whom he met between 5 and 5:30 on Locust Street on the evening the assault is alleged to have occurred in the company with some man other than the defendant. On cross-examination of this witness by the district attorney he was asked if as constable of precinct No. 1 of Upshur County, there was not a suit filed against him and his bondsmen in which they were seeking to recover money alleged in the petition to have been misappropriated by the witness as such constable. Appellant objected for various and sundry reasons unnecessary to state, whereupon the court stated to the witness that he need not answer the question if he did not want to; whereupon the defendant's attorney stated to the court that they were not claiming the privilege of the witness to refuse to answer the question, but urged the objection on the ground that it was irrelevant and immaterial; that the witness could not be impeached in this manner, and because it was prejudicial to the defendant before the jury; whereupon the court sustained the objection, and the defendant excepted to the action of the district attorney in having asked the question on the ground that it was not the proper method of impeaching the witness and was calculated to prejudice the defendant's defense before the jury and the witness before the jury; and on the further ground that the defendant's attorneys before the question was asked, and not in the presence of the jury, stated to the court that they apprehended the district attorney would want to ask the witness this or similar questions, and asked the court to instruct the district attorney that such question to the witness would be improper and not to ask same, the court having declined to so instruct the district attorney and permitted him in the presence of the jury to ask the foregoing question, to which action and ruling of the court defendant reserved his exceptions. This bill is signed by the judge without qualification.

Another bill of exceptions recites that the witness Cumby, on direct examination, testified that he was acquainted with the defendant, Ed Faulkner; that on the evening the assault is alleged to have been com-

mitted he went to the postoffice about 5 o'clock and was returning home between 5 and 5:30 o'clock, walking east along Locust Street in front of the fire station, which is located on the north side of Locust Street; that he saw a little girl in company with a man who was carrying a tin bucket or oil can in his hand; that he did not notice what it was; that they walked diagonally across Locust Street at the intersection of College and Locust Streets; that he was and is well acquainted with Ed Faulkner, the defendant, and that Faulkner was not the man with the little girl whom he saw on the above occasion; that he went on in the direction of home and passed by Mrs. Faulkner's, the mother of the defendant, and saw the defendant, Ed Faulkner, in the back yard cutting some wood; that he did not know the little girl at the time, but some time after meeting them on the occasion aforesaid he saw the prosecutrix in this case and recognized her as the little girl whom he met between 5 and 5:30 on Locust Street on the evening the assault is alleged to have occurred in company with some man other than the defendant. On cross-examination of this witness by the State, the district attorney, over the objection of the defendant, asked the witness if while he was constable of precinct No. 1, Upshur County, he was not down at a certain bawdy house when some fellows commenced rocking the house, and if he did not crawl under the bed. Appellant urged various and sundry objections to this question, which need not be stated, whereupon the court sustained the objections, and defendant excepted. Before the question was asked the witness the attorneys for the defendant, out of the hearing of the jury, requested the court to instruct the district attorney not to ask such question, seeking to show that witness and bondsmen were sued for defalcation while witness was constable, but to confine himself to proof, if he could make it, that the witness had been prosecuted for theft or some misdemeanor involving moral turpitude. The court refused, and the district attorney was permitted to ask the question.

Another bill of exceptions, after setting out these same things in regard to this same witness, shows the district attorney asked the witness Cumby this question: "You are flunky for that hotel, this Central Hotel, aren't you?" referring to the boarding house run by Mrs. Faulkner, the mother of defendant, and "who worked at the hotel in the same capacity you worked before, do you know?" Appellant objected for various and sundry reasons; many of them are stated in the other bills. It is stated that the purpose of the State in asking the question was to get before the jury that a certain party, who has the reputation of being a worthless fellow and who is now on the county farm under conviction of theft, worked at this hotel, and if the witness had been forced to have given the name of said party it would have prejudiced the defendant's defense before the jury and prejudiced the jury against this witness. These were all overruled, but the objection was sustained to the district attorney asking the question.

There is one more bill of exceptions which may be mentioned. This

same witness, after testifying as previously stated, that he had seen the parties, and that the man with the girl was not the defendant, the district attorney, on cross-examination, asked the witness, "Why didn't you go to the grand jury with that information?" to which the witness answered he was not summoned. "Q. You are a citizen of Smith County? A. I claim to be. Q. And you didn't think any more of your fellow citizens than to keep your mouth closed? A. It would have done no good. Q. Do you mean to say the grand jury of this county is so corrupt it would not have done any good for you to go in there and tell what you knew?" Appellant excepted for various and sundry reasons, and the court sustained the objections. Then follows a bill of exceptions with reference to the witnesses who were asked if they paid board bills at Mrs. Faulkner's boarding house, appellant's mother.

These are characteristic of the cross-examination of the defendant's witnesses in order to require the defendant to object. It is plainly to be seen that all this was damaging. The detrimental effect of this upon the jury would not need argument. The court should not have permitted the district attorney to follow this line of interrogation and conduct. In the case of Bullington v, State, 78 Texas Crim. Rep., 187, 180 S. W. Rep., 679, an opinion written by Judge Harper, this character of conducting a trial was criticised and the judgment reversed. That case is mentioned because it is the latest case the writer recalls on this question. The judgment ought to be and will be reversed for this reason.

There is another question of serious import that strikes at the fundamental proposition of fair trial. It is set out in the motion for a new trial at length. The substance will be stated as follows: The alleged offense is said to have been committed about January 24, 1916; defendant was arrested on the following day about 6 o'clock in the evening. The sheriff immediately after the arrest carried him in an automobile to Lindale, a station on the International & Great Northern Railway between Tyler and Mineola, and there caught a train which left Tyler about 8 o'clock p. m. and carried defendant to Dallas for protection and safe keeping. The District Court convened on the 7th of February, 1916. Defendant was indicted on the 10th of February, 1916. The cause was on the 23rd day of February set for trial on the 28th day of February, 1916, this being the first day on which the criminal docket was taken up at that term of court. Defendant was then brought from Dallas to Tyler for trial. That a condition of public sentiment in favor of summary punishment for crimes of the kind charged against the defendant without legal trial existed in that community to a very marked degree, three negroes having been summarily executed on the courthouse square in the City of Tyler, two by burning at the stake and one by hanging, within the last twelve or fourteen years. It was also true that one white man about fourteen years ago charged with felony was killed in the jail "by a vigilance com-

mittee," but the defendant's attorneys and relatives (he had no friends of whom either his attorneys or relatives have heard since this charge was brought against him) had not heard and did not know of any sentiment or spirit on the part of the public or any part thereof to take the law into their hands, and the defendant alleges that he verily believes that if his trial had been conducted without any effort on the part of the relatives of the prosecutrix and the attorneys for the State to arouse prejudice and public sentiment against him and his witnesses, he could have obtained a fair trial, and under the overwhelming testimony in his favor would have been acquitted, but because of the following incidents as well as the manner of the examination of witnesses and numerous other incidents which are not related, the minds of the jury and the public were so inflamed against him and his witnesses that he could not and did not have a fair and impartial trial. The trial attracted a large crowd and the courtroom was crowded with spectators. While the prosecutrix, a little girl, who only lacked a few days of being twelve years of age, when she testified, was testifying and after she had related the circumstances of the outrage that had been committed on her by a man whom she had never seen before the occasion upon which she claims he assaulted her, was asked to point out the man and she thereupon pointed to the defendant; at this juncture a brother of the prosecutrix who was sitting four or five seats back in the courtroom arose with the exclamation, "Lynch the son-of-a-bitch, he is mine," and came rapidly toward the bar, wherein the defendant was sitting, by walking on the tops of the benches; one of the deputies of the sheriff caught him before he got to the defendant; the sheriff, who was standing in the bar near the jury partly drew his pistol, all the time commanding the said brother of the prosecutrix to stop and ordering his deputies to catch him; after the deputy caught him the sheriff ordered him taken from the courtroom; the brother during all this time was saying something which neither the defendant nor his attorneys understood or can repeat; the presiding judge rose from his seat and stepped near the edge of the judge's stand, but said nothing, and the said party was not fined or otherwise reprimanded for his conduct. The defendant was hurriedly taken into an anteroom until quiet and order could be restored. For a brief time pandemonium reigned, people rushed pell mell out of the courtroom and the situation was tense and alarming. All this occurred in the presence and hearing of the jury and the judge and was well calculated to and did excite the jury and cause them to think, as defendant verily believes, that public sentiment was intensely against him and that mob violence was imminent and threatening. When this occurred the defendant had not put on any of his witnesses by whom he expected to establish his sole and only defense, towit: an alibi, that is, that at the time the prosecutrix claimed the assault was committed, towit: between 5:30 and 6:30 o'clock p. m. of January 24, 1916, at a place from the point where she claimed defendant got with her, which required

twenty-five minutes to walk, this defendant was at his mother's board-
ing house. Thereafter, when he put his witnesses on the stand the
State's attorney, by questions which reflected on their honesty and
integrity, prejudiced the jury against his defense and the public who
heard the questions to believe that his defense was manufactured and
his witnesses were testifying from corrupt motive, that the questions
were proper if the attorney expected favorable reply or to prove the
insinuation of corrupt motive implied by the questions, but in view
of the failure of the State in any instance to prove such implication
the defendant alleges, as aforesaid, that he did not have a fair and
impartial trial. It further seems in some instances the State had no
expectation to prove such things. That after the witness Kendrick,
who was no relation to defendant, but who boarded with defendant's
mother, had testified that he went into Mrs. Faulkner's room on Jan-
uary 24, 1916, at or about 5:50 p. m. to pay her his board and saw
the defendant sitting with his mother in her room, which, if true,
absolutely proved his innocence, was asked by the State on cross-exam-
ination if he hadn't stated to Mrs. S. P. Gray and her daughter Nellie
that he had been hired to swear in this case, also if it was not true
that he had been hired and if he was still paying board down there;
neither Mrs. Gray nor her daughter was placed on the witness stand
and no effort was made to prove that the witness was paid or received
any remuneration for testifying. Mr. and Mrs. Hahn, who were also
boarding with Mrs. Faulkner, and who were not related to the de-
fendant, testified that they came out from supper not later than 6:15
p. m. of January 24, 1916, and went into Mrs. Faulkner's room and
sat there until the family went to supper, which was about 6:30 p. m.;
that the defendant was sitting in the room when they entered and
remained there until they, the family, went to supper about 6:30 p. m.,
which, 'if true, proved an absolute alibi for defendant. The State on
cross-examination of Mr. Hahn asked him if he paid board down there,
and if she had not made a trip alone to Corsicana and some other
point. Mr. and Mrs. Hahn were a young couple, intelligent, and would.
under ordinary circumstances without reflection cast on them, have
made a good impression on the jury. Mrs. Guinn, another boarder and
no relation to the defendant, testified that she saw the defendant at
his mother's at various times from 5:50 p. m. January 24, 1916, until
7 o'clock. If her testimony was true defendant could not have been
the man who assaulted the prosecutrix. On cross-examination of this
witness the State proved that her husband was blind. She was asked
what he did and where he was and how much board she paid. Steel,
a young man of good appearance and apparently truthful, testified that
on the evening the assault is claimed to have occurred he met the
prosecutrix shortly after 5:30 p. m. walking with a young looking,
rather light complected fellow at a point where the prosecutrix testified
the defendant was with her; that he never saw defendant until the
morning his case was set for trial, which was about two days before

he testified, and that the defendant was not the man he saw with the prosecutrix, which, if true, negatived the prosecutrix's identity of defendant. On cross-examination the State's counsel asked him the following questions, to which he gave the following answers: "Q. You knew the officers were trying to find out who committed the crime and you didn't tell them? A. I didn't know enough to tell. Q. You knew enough to tell the jury, didn't you? A. I didn't know the man. Q. You mean you didn't know enough then to tell them, you just now know enough, I see, I beg your pardon, when did you find it out? After asking who else he met—Q. Could you see the street that evening? Q. Have you received any money in this case?" Then follows a recitation of Will Cumby's testimony, which is also set out in bills of exception, as was Steel's and Mrs. Guinn's and other witnesses. It is unnecessary here to repeat all of that. It is recited that in the closing argument the district attorney was severe and abusive of the witnesses Kendrick, Steel and Cumby.

The jury retired to consider their verdict at 12 m. and reported to the court at about 2:30 p. m. thereafter that they had arrived at a verdict; the courtroom was packed with people gathered to hear the verdict of the jury; whereupon the presiding judge called defendant's attorneys, the district attorney and sheriff into consultation and it was decided for the court to ascertain what the verdict was, and upon learning that it was a life term ordered the sheriff to bring the defendant from the jail, but upon the suggestion of defendant's attorneys that if he received the verdict at that time it might not satisfy public clamor and he had better wait and receive it "when the crowd had disbursed"; the judge, after reflecting, decided such course was best, and, therefore, held the jury until after supper and received the verdict when the courtroom was empty of spectators, the public having crowded in the courtroom and waited all the afternoon to ascertain what the jury did; that for fear of some outburst against a verdict not assessing a death penalty and violence to the defendant, the sheriff immediately after the verdict was rendered spirited him away in an automobile to Canton, where he was kept until Saturday night, March 11, 1916, when he was spirited back to the jail in Tyler, and his whereabouts was kept a secret from the time of the rendition of the verdict until about Tuesday, March 14, 1916. That all during the trial the sheriff's department, in carrying defendant to and from the jail, guarded him with several deputies. That at the beginning of the trial the sheriff for fear of trouble, as defendant is informed and believes, asked the presiding judge what he thought of searching the relatives of the family before entering the courtroom as a precaution against any trouble; the court asked the sheriff if he thought he could take care of the situation, and upon the reply that he had plenty of deputies and did not fear any trouble, the matter was dropped.

There are other matters raised in the motion for new trial as to the sufficiency of the evidence to support the verdict, etc. This ques-

tion as nere presented does not comport with the dignity of a court in the trial of criminal cases where the life and liberty of a citizen is involved. It is not often in the history of Texas that such things have come before this court as having occurred during the trial of a case in open court. This court, so far as the writer is aware, has always held that a citizen in Texas is entitled to a fair trial under the law and the evidence by an impartial jury, free from obstruction or intimidation by a mob or mob spirit pervading the courtroom, and it will be an unfortunate day in Texas and its jurisprudence and to the life-loving citizenship if mob spirit can pervade the courtroom and influence the jury in their verdict against the testimony, or even where there might be testimony sufficient to support the conviction, that would influence or tend to influence the jury against defendant on such facts. The writer does not know that he could add anything to what·was said by Judge White in his great opinion in Stegall v. State, 22 Texas Crim. App., 464, or to the strongly written opinion of Judge Hurt in Massey v. State, 31 Texas Crim. Rep., 371. These were similar cases to this, and in many respects analogous. Another case came in Lax v. State, 46 Texas Crim. Rep., 628, and Manning v. State, 37 Texas Crim. Rep., 180. The writer would unhesitatingly reverse this judgment if there was no other proposition to be elucidated in this record. The facts have been stated above as found in the motion for a new trial properly verified and uncontradicted. There was and is no question of these matters and incidents occurring as stated. It occurs to the writer that to affirm the judgment on a record of this character would be sanctioning the mob spirit in the courtroom and depriving a man of a fair and just trial and without due process of law. A party may be guilty of a violation of the law as charged, yet these matters do not constitute the criterion of a fair trial in Texas. The facts must not only be sufficient, but the whole trial must be free from contaminating influences that warp the jury "from the living truth," and which carries them away from the fair and just trial the Constitution guarantees. It must be a trial by an impartial jury under the laws of the country, and not by a jury overawed or intimidated by a mob spirit so manifested. If there was not some reason why the sheriff spirited a man away to Dallas to await an indictment by the grand jury, it seems to have been on his part a work of supererogation; but this record shows, if the statements are to be credited, that he was spirited away in order to avoid anticipated mob violence. As soon as the trial was had he was again spirited away before the people in the community ascertained the jury's verdict. The verdict was known to the court in the early evening before 3 o'clock, and yet the jury was kept out in the solitude of their consultation room so that the crowd about the courthouse might be "disbursed" and scattered to their homes about the supper hour, and when this occurred the court came in, received the verdict of life sentence, and the defendant was again spirited away to another county and kept for some days. These statements are not questioned. Under the serious charge of rape upon a

girl under fifteen years of age there must have been serious apprehension on the part of the sheriff or the officers would not so have acted. There is no evidence of the fact they were not capable of knowing and did not know the spirit of their community. Guilty he may be under the State's case; innocent under his, the defendant's, he would still be and is entitled to a fair trial before an impartial jury. It is shown here that the judge during the excitement in the courtroom when the outburst came arose from his seat and stood; he did not even command silence in his court; he did not even reprimand or impose a punishment for contempt. This judgment will be reversed for this, if for no other reason.

There are exceptions to the court's charge. Some of these charges are not technically correct and not favorable to defendant. Upon another trial these matters will be avoided by the trial court. We wish to enjoin again upon the trial courts the duty of charging the law of the case, and wherever the question is favorable to defendant to give an affirmative charge calling the attention of the jury to the law. Negative charges presenting a defendant's side of the case have been criticised and many reversals granted for so giving. The law requires the jury to be affirmatively charged as to the law of the case and especially as to defendant's theories which may be favorable to his side either as to guilt or as to minimizing the punishment in case of guilt. These matters should be more closely guarded by the trial courts to the end that they will not become the subject of investigation upon appeal. It is a useless consumption of time and evasions on the law of the case, jeopardizes the conviction and often leads to reversals. It is just as easy to charge the law of the case rightly as it is to do it negatively or evasively, and by charging correctly the chances of reversing upon those questions will not occur. In all these character of cases the trial should be held with a view of giving the defendant a fair trial under the law to the end that his trial may be final, if he is guilty, and not to be brought on appeal for reversal for another trial. It is not only the duty of the district judge to see that this occurs, but it is a duty devolving upon prosecuting officers to see that the citizenship of his country, when unfortunate enough to be charged with a violation of the law, shall have a fair and legal trial to the end that justice may be dispensed. It is not just nor right to obtain a conviction under doubtful methods, or by depriving a defendant of any right guaranteed to him by the Constitution or laws of this State, even though the judge or district attorney may regard them as technical. The Constitution and legislative acts have provided these matters, and it is the duty of the officials of this State in dispensing law and justice to follow the mandates and the enactments of the legislative body, and above it all to so construe those matters as to see that the accused has a fair and legal trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

HARPER, JUDGE, absent.

PRENDERGAST, PRESIDING JUDGE (concurring).—It is the duty of the prosecuting attorneys in all legitimate and proper ways to show, if they can, that an adverse witness is testifying falsely or corruptly. If this can be done by cross-examining the witness, all well and good. It is also always proper and legitimate to show that a witness is interested, biased or prejudiced, and to prove anything which would legitimately show or tend to show this. If this can be done by cross-examination of the witness himself, 'so much the better. If they can not show this by cross-examining the witness himself, they can show it by other legitimate testimony. I think some of the questions along' these lines asked some of appellant's witnesses, as shown by the bills, were proper and legitimate.

But some of the bills unquestionably show that appellant's attorneys learned that certain questions would be asked certain witnesses seeking to impeach them, which were clearly illegal and improper, and known to be so by the prosecuting attorneys at the time; and before they were asked, so informed the trial judge and besought him to instruct and require the State's attorneys not to ask them. The court refused to do this, and the State's attorneys asked them. In my opinion, as presented by the bills, this presents reversible error. (Vick v. State, 71 Texas Crim. Rep., 50; Bullington v. State, 78 Texas Crim. Rep., 187, 180 S. W. Rep., 680.) These cases are not like those of Sweeney v. State, 65 Texas Crim. Rep., 593, and those cited therein, and a large number of other cases to the same effect. On this point I concur in the reversal.

I do not concur in all Judge Davidson says and holds in his opinion.

The motion for new trial, or allegations therein, although sworn to as a pleading, does not prove itself. Besides the judgment of the court overruling it states that evidence was heard thereon, and after hearing it, the judge overruled it. What that evidence was is not disclosed. Hence, the overruling of the motion for new trial would not present error.