## O. T. LIGGON v. THE STATE.

### No. 4808.    Decided January 16, 1918.

#### 1.—Murder—Death Penalty—Insufficiency of Evidence.

Where, upon trial of murder and a conviction assessing the death penalty, the evidence was insufficient to sustain the death penalty conviction, the judgment should be reversed and the cause remanded.

#### 2.—Same—Mob Influence—Intimidation of Court and Jury.

Where, upon appeal from a conviction of murder, the record showed that the environments of the trial and the condition of things surrounding it would make it an absurdity that the appellant had had a fair trial, and that the conviction was secured in a court surrounded and dominated by a mob influence, and that it was impossible for the appellant to have had a fair trial by an impartial jury, the judgment must be reversed and the cause remanded. Following Steagald v. State, 22 Texas Crim. App., 464.

#### 3.—Same—Waiver—Mob Violence—Impartial Trial.

Where, upon an appeal from a conviction of murder, the facts showed that appellant could not be held to waive any right that was guaranteed him by the law, because such waiver would have been met with death by lynching at the hands of a mob, it must be held that he has not had a fair and impartial trial, yea, even not a legal trial, and though he were guilty he is still entitled to have

a fair trial before an impartial jury, and the judgment must therefore be reversed and the cause remanded. Following Massey v. State, 31 Texas Crim. Rep., 371, and other cases.

#### 4.—Same—Rule Stated—Impartiality of Law.

The accused must be tried and convicted legally, and, though he may be a negro as in the instant case, he must be tried in precisely the same manner as if he were a white man, etc. Following Calvin v. State, 25 Texas, 789, and other cases.

Appeal from the District Court of Cherokee. Tried below before the Hon. L. D. Guinn.

No brief on file for appellant.

*E. B. Hendricks,* Assistant Attorney General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of the murder of Melvin Mayfield, and given the death penalty.

Briefly stated, the evidence is to the effect that appellant and a white man were doing certain work at a lumber mill, and three other white men were doing work at another part but near each other. Appellant and his co-worker were using what they called a dolly. This was economized for the purpose, it seems, of moving lumber into a place where they were preparing it for some given purpose. This dolly was unloaded by defendant and his co-worker, and the other three white men came and took it away. When appellant had occasion to use it he discovered it was gone, and finally found it in the possession of the three white men, and sought to obtain it to be used in his allotted work. This was refused and the trouble ensued. There was an issue as to how the trouble began. A piece of wood was used in the trouble, otherwise it seems to have been a fist fight with three white men against the negro, who is the defendant. As natural under such circumstances, he got the worst of the fight. Quoting the language of Mr. Truly, who was foreman of the shipping department of the mill: "I was acquainted with Archie Mayfield and Melvin Mayfield and Clinton Pace and Levy Jordan, and all of these parties in this mix-up; they were working for me there. I was acquainted with the defendant then; his name is O. T. Liggon, and he was working at the mill at that time. I know Joe Sessions and Mr. Palmer, but he just worked part of that morning, and I wouldn't know him if I were to see him likely. I think I can tell about this trouble down there on the morning of the 7th. I was coming around the north end of the shed or mill there, or the planer, rather, and I saw one of the white boys run with a stick in his hand in this position (showing in a striking position). I couldn't tell who he was, or which one it was, and I saw him strike with it and I knew he was striking at something. I thought he was striking at a large rattlesnake that had been seen in the yard, and I broke and

run to where they were and when I got there they were striking this negro, and the three white boys were fighting him." This much of the testimony is brought out to show that it was a sudden quarrel and fight and the condition of the fight as shown by a disinterested witness, Mr. Truly. Melvin Mayfield, if he was in the fight, about which there is some issue, went to a car, and appellant, testifying to the fact that he was trying to escape, ran in the car and while in there he struck Melvin Mayfield with a piece of timber which resulted in his death. The State's contention was that there was no occasion for his striking Mayfield. His contention and testimony was to the effect that Mayfield had drawn a large piece of timber on him and was in the act of striking him when he struck in self-defense. Without going further into details this evidence will not justify, under any viewpoint, a death penalty conviction.

One of the most serious questions is brought forward in the motion for new trial and manifested by bills of exception, towit: that the conviction occurred in a court surrounded and dominated by mob influence. At the risk of being prolix, it is thought necessary to give some of the salient features of the action of the mob that surrounded the court and the trial of the case. The motion for new trial is very full and sets out in detail the action of the mob, and these grounds of the motions are referred to and verified in the bills of exception.

Bill of exceptions No. 1 recites that on the 7th day of August, 1917, Melvin Mayfield, a white man, was killed near Alto, Cherokee County; that appellant was accused of this killing, and immediately following the killing a large number of white men came running toward the scene of the trouble; that defendant, fearing violence at the hands of the white men, ran into the woods and was not found until the next day, August 8th; that several hundred people of Alto and other parts of Cherokee County were hunting defendant Tuesday, Tuesday night and Wednesday; that feeling among said mob of people was very high against defendant and they freely expressed their intention of lynching defendant should they be able to find him; that defendant was captured and taken into custody by the sheriff of Cherokee County on Wednesday, August 8th, and taken to the county jail; that defendant was captured and landed in jail without the knowledge of the mob; that said mob demanded that the grand jury of Cherokee County, which was not then in session, be reconvened on Thursday, August 9th, and said defendant indicted, tried and executed at once; that said mob was threatening to lynch defendant if he were not immediately indicted, tried and executed; that the grand jury was reconvened on Friday, August 10th, and indicted appellant on August 10th for the murder of Melvin Mayfield; that defendant's counsel, who were appointed by the honorable District Court only the evening before to represent defendant, had not time to investigate said cause and prepare for trial, as set out in paragraph No. 1 of his motion for a new trial; that at the

time the grand jury brought in said indictment the crowd of people that had gathered about the courthouse was not very large and defendant was advised that it would be better for him to waive his two days after indictment and be tried before a large crowd could gather; that defendant, fearing that if the mob should assemble before his trial was concluded he would be lynched, waived his two days allowed him by law and announced ready for trial, as set out in his motion for new trial; that during the progress of said trial several hundred people from in and around Alto and several other places in Cherokee County, crowded into the courtroom where said case was being tried; that said crowd of people was composed of the same individuals that had been hunting for defendant before he was taken into custody, and that were threatening to lynch defendant; that the feeling of said crowd of people was very intense; that their resentment and prejudice against defendant was very great, which was manifest in their demeanor; that the defendant, through fear of violence at the hands of said mob of people, fearing that they would execute the threats they had made to lynch, did not in open court object to the attitude, conduct and demeanor of said mob previous to nor during the trial of said case, but did object to said attitude, conduct and demeanor of said mob in paragraphs Nos. 1 and 2 of his motion for new trial, which was by the court overruled, to which decision the defendant excepted. This bill is signed by the trial judge without qualification or explanation or statement of any kind.

The second bill recites that after the evidence had been introduced and the case closed about 6 o'clock p. m., August 10, 1917, a large crowd of people from in and near Alto, the place of the killing, were crowded into the courtroom; that the honorable district judge trying said case, fearing violence to defendant if said crowd of people remained to hear the argument of counsel in said case, announced publicly that the court would adjourn until 8:30 a. m. the next day, August 11th; that said crowd of people left said courthouse and dispersed from the county seat; that said announcement was made for the purpose of clearing the courtroom of said crowd of people; that about 8 o'clock p. m. August 10th, the judge recalled the jury in the case, reconvened the court and informed counsel for State and defendant to proceed with the argument in the case; that said arguments were concluded, the charge of the court read, and the case turned over to the jury at about 11 o'clock p. m. August 10th; that the jury did not bring in a verdict that night; that early the next morning, while the jury was deliberating upon their verdict, a large crowd began to assemble about the courthouse square and stationed themselves on the southwest corner of said square in plain view of the jury, who were lodged in a room on the southwest corner of the courthouse; that before the jury had reached a verdict in said case a large mob had assembled and were conducting themselves in an angry and threatening manner; that their conduct and demeanor was such as to attract the attention of the jury

in this case and affect them in arriving at a fair and impartial verdict, as set out in paragraph No. 3 of defendant's motion for a new trial; that the jury reached a verdict some time before noon of the 11th day of August; that the court attempted to have the jury taken to the penitentiary, which was located several blocks from the courthouse, where the defendant had been removed by the officers, as it was considered a safer place to keep defendant, and there receive the verdict of the jury; that said plans miscarried; that said mob was growing impatient at the delay in receiving a verdict from the jury and was manifesting a threatening attitude; that before the jury had returned its verdict into court the sheriff, fearing violence at the hands of the mob, attempted to speed the defendant out of the county and lodge him elsewhere for safe keeping; that a part of said mob secured several automobiles and overtook the officers charged with the custody of the defendant and compelled them to return to the courthouse with defendant; that said officers had gotten one mile north of the town of Jacksonville, Texas, or sixteen miles from Rusk, where the trial was had and where the defendant had been in jail, when the mob overtook them and compelled them to return; that said mob crowded around the officers in charge of the defendant in plain view of the jury, who, although they had announced some time before that they were ready to report, had not returned their verdict into court, as set out in defendant's motion for new trial, paragraph No. 3; that defendant was brought into open court, the jury called in and announced their verdict of guilty of murder as charged and assessed his penalty at death; that when said penalty was read by the clerk of the court a burst of applause went up from said mob, and the honorable District Court before whom said case was tried was compelled to repeatedly rap for order and severely rebuked said mob by threatening to put them in jail, as set out in paragraph No. 3 of defendant's motion for new trial; that defendant in paragraph No. 3 of his motion for a new trial objected to the conduct, demeanor and attitude of said mob as set out above after the case had gone to the jury, in that it was such as to influence the jury in arriving at their verdict, said conduct, attitude and demeanor of said mob occurring in plain view of the jury deliberating upon their verdict, which objection and motion for a new trial were overruled by the court, to which decision and ruling of the court defendant in open court excepted and tenders this his bill of exceptions. This bill was examined and signed by the trial judge without any statement whatever either of qualification or explanation.

Bill No. 3 recites that after the indictment was returned on the 10th of August, that on said 10th and 11th of August he was tried for said murder and convicted and sentenced to hang; that previous to his arrest he was hunted by a mob of several hundred people with a view of lynching the defendant if he were to be found; that the sheriff of Cherokee County captured said defendant, unknown to the mob and

landed him in jail; that said mob demanded an immediate trial, conviction and execution; that said demands of said mob were communicated to the defendant; that for fear the mob would execute its threats, defendant waived his two days after indictment, his motion for a change of venue, his right to have a special venire summoned in his case, and announced ready for trial; that defendant's counsel, who had been appointed to represent defendant only a few hours before and had not had time to investigate said case, fearing for the life of said defendant, agreed to said waivers and announced ready for trial; that said matters were called to the attention of the court in defendant's motion for a new trial in paragraphs Nos. 1, 2 and 3; that said motion was overruled by the court and exception taken, and the court approves this bill without any statement, qualification or explanation.

Bill No. 4 recites that after the jury had returned its verdict into court, in which they found appellant guilty and assessed the death penalty, that defendant and his counsel were told by the court that if they expected to file a motion for a new trial they must do so at once; that the court feared the mob which was threatening to lynch the defendant would execute its threats if defendant remained in the county the two days, which defendant had in which to file this motion for a new trial; that said motion must be made and passed on and defendant sent to a place of safety at once; that defendant, fearing the mob, did not in open court object to making his motion for a new trial on August 11th, and did not ask for the two days allowed defendant by law for filing a motion for a new trial. The court ordered said motion to be filed and disposed of at once, to which decision and order of the court defendant then in open court excepted. This bill is also signed by the trial judge without any statement, qualification or explanation.

Another bill of exceptions was reserved to the overruling of the motion for new trial.

The bills are hardly as full in detail as were the grounds of the motion for a new trial. Without stating fully the grounds of the motion, some of these statements will be noted. After the sheriff of the county had placed defendant in jail a mob threatened to hang and kill him regardless of law if he was not hung by the verdict of the jury; that a mob had threatened before the trial of the case that if a change of venue was granted that they would hang and lynch defendant; that if the defendant received less than a death penalty they would hang him at once; that at all times after defendant was lodged in jail guards and spies were stationed by the mob at several placed in the various parts of the county and guards were kept around and near said jail to watch and give notice of any attempt to remove the defendant from said county jail; that on all occasions when said defendant was in the courthouse being tried the mob was present and determined to have its wishes carried out; that the feeling was so intense and the threats so strong and the prejudice so great against defendant that no

man would risk his life by making an affidavit for change of venue in this case; that defendant's attorneys, who were appointed by the court to defend him, asked the court to change the venue on his own motion, which the court refused to do because it would at once precipitate an attack by the mob upon the defendant, which he desired to avoid; that defendant having been in jail continuously since August 8th, was not ready for trial, had not summoned any witnesses in his behalf, and his attorneys, who had been appointed by the court only the evening before the trial, could not interview the defendant until the next morning about 9:30; that defendant and his attorneys were compelled to waive the two days after service of copy of indictment, to announce ready for trial and go into the trial on the day that the indictment was found and returned, because as defendant and his attorneys well knew and had been told by a large number of citizens that if he did not announce ready for trial and in fact go into the trial of said case at once, that the mob would hang and kill the defendant and he knew that they intended to do it, which facts were known to the trial judge.

Among other things, in the second ground of the motion for new trial it is stated that the mob in and around the courthouse demanded a speedy and immediate trial for defendant, which he was compelled to accept, and he was compelled to accept a special venire which had been called in another case then pending in said court, which facts were known to the trial judge.

In the third ground of the motion for new trial it is stated that the jury, after retiring to consider of their verdict, was lodged in the jury room on the southwest corner of the courthouse; that several windows opened to the south and several windows opened to the west in said jury room; that the mob demanding the death penalty was located on the southwest corner of the public square of said courthouse; that the jury could see the conduct and demeanor of said mob; that the conduct and demeanor of said mob was such as to attract the attention of the jury in this case and affect them in rendering a free and impartial verdict; that before the jury returned its verdict into court, the sheriff, fearing violence at the hands of said mob, attempted to speed the defendant out of Cherokee County and lodge him elsewhere for safe keeping; that the mob overtook the officers charged with the custody of the defendant and compelled them to return to the courthouse with defendant; that when they arrived at the courthouse with defendant, they stopped on the west side of the courthouse in plain view of the jury then deliberating upon their verdict; that said jury could see and hear the demands of said mob; that the mob crowded around the officers having custody of the defendant in plain view of the jury and it was with difficulty that they were prevented from executing their threats; that said mob demanded that defendant be returned into court and that the jury bring in a verdict assessing defendant's punishment at death; that the jury thereafter brought in a verdict assessing the death

penalty as is shown by the judgment of the court; that when said death penalty was read by the clerk of the District Court a burst of applause went up from the mob, and the honorable district judge before whom the case was tried was compelled to repeatedly rap for order and severely rebuked said mob by threatening to land them in jail, which facts were known to the trial judge.

The fourth ground of the motion for new trial is practically the same as one of the bills of exception, setting out the fact that defendant and his counsel were told and knew that if they made a motion for a new trial and obtained a new trial, that the defendant would be taken out by the mob and lynched; that the defendant and his counsel were compelled to present this motion for a new trial on the same day that the verdict was returned; that defendant and counsel did not have time to investigate the case and things pertaining to other material facts upon which to base a motion for new trial because the mob was demanding that defendant be sentenced at once; that defendant was prevented from taking advantage of the legal procedure incident to the trial and its preliminaries, fearing at all times that the mob would execute its threats and carry out its determination. These facts were known to the trial judge.

The fifth ground recites that the jury was prejudiced against the defendant, a negro, for killing deceased, a white man; that such prejudice against defendant having been excited and strengthened by the presence, assembling, movements and activities of the mob in and about the courthouse and during the trial and while the jury was retired considering the case and before they returned their verdict into court. All of these facts were known to the trial judge.

These statements are rather prolix, or at least at length, but it is deemed necessary to so state to show the environments of this trial and the condition of things surrounding it. It would be an absurdity to hold that this appellant has had a fair trial under the circumstances stated. On the motion for a new trial these facts were not controverted by the State. They were admitted to be true by the approbation of the trial judge. They came under his observation, and to this he certifies in approving the bills of exception. It has always been the pride, boast and glory of the Anglo-Saxon jurisprudence, whether in England or America, that the accused should have a fair trial by an impartial jury. This is guaranteed by section 10 of the Bill of Rights. The fifteenth section of the same Bill of Rights guarantees that the right of trial by such jury shall remain inviolate. Our Legislature has seen proper in its wisdom to guarantee and surround and guard this provision of the Constitution. The essence of all criminal trials wherever this basic principle is found is the right of trial by jury. "An impartial jury and a fair trial is what the State demands, and in her demands she is no respecter of persons. She has one law for all—the high and the low, the rich and the poor, the friendless, the most de-

based and hardened of criminals. The greater and more horrible the crime charged the greater and more imperative the necessity that these safeguards—these landmarks of the law—should be constantly looked to and kept steadily in view, lest, perchance, they should be forgotten, denied or ignored in those natural promptings of a manly, it may be, and certainly a human instinct, which, standing appalled and outraged at the very contemplation of such heinous iniquity, condemned the suspected criminal in advance, and mainly, perhaps, through the magnitude and turpitude of his imputed crime. In such cases, when the popular mind is inflamed and popular indignation is ready and clamorous to become the executioner of its own vengeance, it is the part of an honest, fearless, manly judiciary to uphold the standard of the law, and to vindicate its majesty and integrity regardless of all consequences." Steagald v. State, 22 Texas Crim. App., 464.

The testimony in this case does not show one of those appalling or heinous crimes. It may be fully questioned, if not maintained, that the defendant was not the aggressive party in the sudden affray which came up as heretofore indicated by the testimony. There is nothing about the case or its facts to attract the attention of heinousness. It was one of those unfortunate things that sometimes occurs, but there was nothing to indicate the enormity of circumstances or such malice which characterize murder justifying or requiring a death penalty. It was a sudden quarrel coming up in a moment, unexpectedly and unattended by any evidence of atrocity or heinous facts. Appellant might have applied for a change of venue, but the facts justified his failure so to do. As was said by Judge Hurt in his opinion in Massey v. State, 31 Texas Crim. Rep., 371: "Appellant was not required to apply for a change of venue, when, if granted, his life would be forfeited—the price. To hold that a trial under such circumstances was fair, impartial, and legal, would be a travesty on decency, law, common sense, and justice, notwithstanding good men may have tried appellant." And in looking at the facts stated in the motion for new trial and approved in bills of exception, we find that the judge was cognizant of all these matters, and in this as in the Massey case, supra, really gave as his reason for not changing the venue, that to do so would at once precipitate an attack upon the court or rather the defendant in the presence of the court and during his trial, and lynch him. To quote from Judge Hurt's opinion in the Massey case further: Such a state of affairs existing, if true, the court being environed and dominated by such a mob, breathing out such threats to the life of appellant, it is solemn mockery to talk, think, or imagine a fair trial under such conditions." Under such facts as are in this record appellant could not be held to waive any right that was guaranteed him by law, which if he did not waive would be met by death by lynching at the hands of the mob. Appellant has not had a fair and impartial trial. He has not even had a legal trial, and if he were as guilty as it is possible for

a man to be of a violation of the law, yet he still is entitled to have a fair trial before an impartial jury, and in a court unawed by mob violence, but he should be surrounded by all the sanctity and safeguards guaranteed by our law. The officers in this case, it seems, so strenuously feared the action of the mob they undertook to spirit appellant away during the trial. He had a right to be present in court and under the protection of the law. "It was his court, the court of every citizen of this State; its portals must be kept open, and no mob has a right to close them against a citizen who is being tried for his life, liberty or property. He was deprived of this right by a mob, and not by the court, for the writer is impressed by this record with the belief that the ruling of the court in regard to the change of venue and motion for a new trial was made to save defendant from the vengeance of the mob." Massey case, supra.

Quoting from Calvin, a slave, v. State, 25 Texas, 789: "The accused must be tried and convicted legally; and though he be a negro, he must be tried in precisely the same manner as if he were a white man; and we can not strain the law, even in the estimate of a hair, because appellant is a negro, or because of any unusual features of this case. In all civilized countries the law has always shown the most sacred regard for human life, and judicial tribunals in the administration of the criminal law have always deemed it proper to adhere with great strictness to established rules, where life and liberty are concerned. If courts could feel themselves at liberty to depart from principle or established rules in order to hasten the punishment of even great offenders, such departures might result in the destruction of those safeguards which, in accordance with the genius of all free governments, have been provided for the life and liberty of men." See also Faulkner v. State, 80 Texas Crim. Rep., 341, 189 S. W. Rep., 1077.

The Massey case, supra, in many of its aspects, viewed from the standpoint of the performances and eccentricities of the mob, is very much like the facts and the environments of this case. The cases are different, of course, on the facts as to the crime. That committed in the Massey case was rape by a negro upon a white woman, which was calculated to and at least does arouse the passions of our white race. But whatever may be said, the defendant has not had a fair trial from any possible view of it, and of this there is no question, not even an issue or controversy manifested by the motion for new trial or the statement of facts occurring with reference to the mob and verified and approved by the trial judge as to all details, facts and circumstances. Without discussing these matters further this judgment will be reversed and the cause remanded for a trial in accordance with the rules of law and the guaranteed rights under our Constitution and laws.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*