## Dave Goodwin v. The State.

No: 13718.   Delivered November 26, 1930.
Rehearing Denied May 27, 1931.
Reported in 38 S. W. (2d) 806.

The opinion states the case.

*H. H. Taylor* and *G. C. Barkman,* both of Texarkana, for appellant.

*R. G. Waters,* District Attorney, and *L. C. Boswell,* County Attorney, both of Texarkana, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MARTIN, JUDGE.—The offense is murder, the penalty death.

Lloyd Elliott in February, 1930, had a bunch of hogs which ranged in and near the Sulphur River bottom in the vicinity of where appellant and his father and brother lived. Some of these hogs were missing on Friday. The deceased began a search for his missing hogs and visited at the home of one of the Goodwins. It is shown that appellant's father had killed a short time before this homicide a hog which apparently belonged to Elliott, and that appellant became afraid that Elliott was after him or his father for the theft of his hog and told his brother that he was going to kill him. Deceased failing to return home, a searching party was organized and on Monday morning his body was found in the Sulphur river, the head buried in the mud and the feet protruding from the surface of the water. An examination of the body disclosed two wounds, one in the head, apparently made by a 410 shotgun, and the other in the body, indicating a wound made by a .38 calibre rifle. The state introduced Bud Goodwin, a brother of appellant, who testified that appellant admitted to him he had killed deceased and that the two had placed the body in the river where it was subsequently found.

For himself appellant testified that Elliott came upon him unexpectedly in the woods, where he was hunting rabbits; that a difficulty ensued and that he shot in self-defense, and that afterwards, becoming uneasy, he had hidden the body in the river.

Over objection a 410 gauge shotgun and a .38 calibre rifle shown to have been in possession of appellant on the day of the homicide were introduced in evidence by the state over objection of appellant. At the time these weapons were offered the state was attempting by circumstances to connect the appellant with the crime, and they were clearly admissible for this purpose. It has been stated: "The State may introduce in evidence the weapon with which it is charged the homicide was committed, if it is properly identified as belonging to the defendant * * * or any weapon found in the possession of the accused or his criminal associates, which is similar in form and character to that which was employed." Underhill's Criminal Evidence (3d Ed.), par. 494. See, also, McBrayer v. State (Texas Crim. App.), 34 S. W., 114; Fay v. State, 52 Texas Crim. Rep., 185, 107 S. W., 55; Williams v. State, 60 Texas Crim. Rep., 453, 132 S. W., 345; Betts v. State, 60 Texas Crim. Rep., 631, 133 S. W., 251; Rodriquez v. State, 32 Texas Crim. Rep., 259, 22 S. W., 978.

Nor do we think there was any error committed in introducing the rifle which bore on its barrel a notch recently filed and permitting state's counsel to comment thereon. It is shown that appellant was in possession of a file with this rifle on the day of the homicide. Bill of Exception No. 2 presenting this matter contains the following paragraph:

"It is certified that the State had introduced testimony showing defendant had filed the notch on the gun after he killed deceased."

If this notch was placed there by appellant in a braggadocio spirit to preserve and to illustrate his prowess as a killer, it was admissible on the question of his state of mind, this being an issue in all murder cases of the character shown here. If it had no significance, then it could not have harmed appellant.

The crime was committed on Friday. On the Monday week following, appellant was apparently placed on trial. He filed no application for change of venue. Among other things alleged in his motion for new trial was the existence of a mob spirit. Testimony was introduced on a hearing of this motion showing that appellant had been spirited from jail to jail immediately preceding his trial and that he was guarded by some twenty officers who sat around him during the trial.

If all of appellant's charges in his brief are true, this case should not have been tried in Bowie county, but as the matter is presented, we are powerless to give him any relief. The question was raised by appellant for the first time after his conviction and clearly presents nothing for review by us without usurping authority which has been withheld from us by statute. The record as a whole is perhaps sufficient to show that the unreasoning and revengeful passion of the multitude had been lighted, and that its spirit brooded over appellant's trial. This is the most ancient and the most sinister enemy of the orderly processes of the administration of justice by the courts with which governments have had to deal, and Anglo-Saxon jurisprudence is replete with safeguards against it. They have been incorporated into our Constitution and laws and the procedure for their preservation defined and these we must follow. If the law had given to the courts the right to arbitrarily grant relief to the accused in any case they saw fit, the showing made in this record would present a serious question. Such right, however, does not exist.

In addition to the above, which would present a serious question if properly presented, we note the court gave the following in charge:

"I instruct you that the witness Bud Goodwin is an accomplice.

"Now, you are instructed that you cannot convict the defendant upon the testimony of said Bud Goodwin alone, unless you first believe that his testimony is true, and connects the defendant with the offense charged, and then you cannot convict the defendant upon said testimony unless you further believe that there is other testimony in the case, corroborative of the testimony of said Bud Goodwin tending to connect the defendant .

with the offense charged; and the corroboration is not sufficient if it merely shows the commission of the offense charged."

Charges in similar language have been condemned in a multitude of cases. We take the following from the case of Grant v. State, 60 Texas Crim. Rep., 360, 132 S. W., 350, 352, in an opinion by Judge Ramsey: "The authorities holding this charge erroneous are unbroken in this state since the case of Bell v. State, 39 Texas Crim. Rep., 677, 47 S. W., 1010. See Fruger v. State, 56 Texas Crim. Rep., 393, 120 S. W., 197; Maples v. State, 56 Texas Crim. Rep., 99, 119 S. W., 105; Early v. State, 56 Texas Crim. Rep., 61, 118 S. W., 1036; Time v. State (60 Texas Crim. Rep., 58), 130 S. W., 1003; Fruger v. State, 50 Texas Crim. Rep., 621, 99 S. W., 1014; Jones v. State, 44 Texas Crim. Rep., 557, 72 S. W., 845; Garlas v. State, 48 Texas Crim. Rep., 449, 88 S. W., 345; Hart v. State, 47 Texas Crim. Rep., 156, 82 S. W., 652; Crenshaw v. State, 48 Texas Crim. Rep., 77, 85 S. W., 1147; Washington v. State, 47 Texas Crim. Rep., 131, 82 S. W., 653; Barton v. State, 49 Texas Crim. Rep., 121, 90 S. W., 877; Dixon v. State (Texas Crim. App.), 90 S. W., 878; Morawitz v. State, 49 Texas Crim. Rep., 366, 91 S. W., 227; Reagan v. State, 49 Texas Crim. Rep., 443, 93 S. W., 733; Oates v. State, 48 Texas Crim. Rep., 131, 86 S. W., 769; Barrett v. State, 55 Texas Crim. Rep., 182, 115 S. W., 1187; Newman v. State, 55 Texas Crim. Rep., 273, 116 S. W., 577; Tate v. State, 55 Texas Crim. Rep., 397, 116 S. W., 604." See, also, Standfield v. State, 84 Texas Crim. Rep., 447, 208 S. W., 532.

Manifestly, testimony should show guilt beyond a reasonable doubt, not merely "connect" the accused with offense, as charged above. There may be facts under which such a charge would be harmless error, but we do not here pause to analyze the question, since we are inhibited by the statute from reversing unless a proper exception in writing was directed by appellant at the charge in the trial court. We find no exception of any character to the charge of the court and, therefore, unless the error is fundamental, we are powerless to grant appellant relief. It may seem harsh and unjust for a man's life to be taken whom the record shows has not been tried according to law, but such appears to be the demand of the Legislature and to it we must submit. The rule which under these circumstances refuses us the right to reverse for such an error is inexorable, and is an apt illustration of the fact that affirmances, as well as reversals, may result from technicalities.

Finding no error in the record which we are permitted to consider, the judgment of the trial court is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been exam-

ined by the Judges of the Court of Criminal Appeals and approved by the Court.

Hawkins, J., absent.

### ON MOTION FOR REHEARING.

MORROW, Presiding Judge.—The matter upon which the greatest reliance is placed is the claim that the appellant's trial was not fair and impartial. In the consideration of that subject, note is to be taken of the fact that this court is controlled by the record, and looking thereto, the proof is evident that the deceased was killed by the appellant. It is quite sufficient to show that the killing was upon malice aforethought.

The brief in behalf of the accused is ably prepared and forcibly presented in oral argument. In it, however, we have found much that is not apparent from the record. In passing, it will be said that this court is not impotent to give relief against a judgment of conviction when the record is such as makes it apparent that the conviction was not upon a fair and impartial trial. This is true, particularly in a capital case where the extreme penalty is assessed, even though there are statutory provisions available to the accused which ordinarily would be waived if not asserted during the trial.

Asserting in substance that the trial was rendered unfair, it is claimed that the mob spirit pervaded the trial, coerced the jury, and overawed the court. If such were the case, there are many precedents which would support this court in anulling the verdict.

Touching the application of the principles announced and the statutes cited in the appellant's brief, the facts shown by the record must guide this court. In the matters of procedure, that is to say, in the introduction of evidence and instructions to the jury, there were no errors by the trial court which would authorize a reversal of the judgment.

The only argument urged against the verdict is that the court erred in refusing to grant the motion for new trial which is based upon the claim that the trial was not fair and impartial; that the mob spirit was prevalent; that there were fifteen or twenty officers present at the trial; that there were current reports that a verdict less than death would be followed by a mob. In support of the motion, the appellant called the sheriff, G. H. Brooks, who testified in substance that there were present at the trial five sheriffs besides himself, who were visitors from other counties; that the deputy sheriffs of Bowie county were present, as well as the constables and deputies of three precincts of the county, and the United States marshal. The sheriff said that there was no evidence of a mob at the trial; that the people were stirred up and horrified by the offense; that there was some feeling against the accused; that the accused was moved from time to time after his arrest as a precaution against any formation of a mob, but that this was not done from any knowledge or

information that a mob was likely. The sheriff said he felt it was his duty to keep the accused hid. He testified further that the crowd in the court room was larger than he had seen it on any previous occasion; that it was orderly, and that there were no disturbances except from children who were restless; that many of the people were school children who had been brought in by their teacher in order that they might observe a trial. The sheriffs were inside of the bar. They were dressed in plain clothes and no arms were exhibited. The deputies were scattered about over the court room. The sheriffs were not known to the jurors, but were strangers. The only information or message received by the sheriff was that he had better use precaution, and upon that information he took the accused out of the county before the trial. The people were practically quiet during the trial.

McCall, the deputy sheriff of Bowie county, testified that he heard that there might be a mob, but that none was ever formed; that the accused was moved to Jefferson for two days, and from there to Marshall for two days and a night; that he moved the appellant under instructions from the sheriff. His testimony was in substance the same as that of the sheriff.

In overruling the motion for new trial, the trial judge used the following language, which is attached to the bill complaining of his action:

"Approved with the following qualifications:

"The Court does not certify to any of the facts, grounds, or reasons alleged in the above bill, but on the other hand says that there was no evidence, demonstration, or indication of even any atmosphere of any violence, anger, or mob spirit or feeling on the part of those in attendance upon this trial or elsewhere known to the jury, and in order that such might not arise in or around the court house, if any should exist on the part of the relations or immediate friends of the deceased, the Court had the peace officers referred to in this bill quietly stationed in and around the court house; but no display was made of them to or before the jury; and the entire attendance throughout the trial were quiet, attentive, and gave no indication of any feeling, if any they had, either for or against the defendant.

"The number of people in attendance upon this trial is accounted for by the fact that the people especially the rural sections, throughout the county were not busy and they 'brought their whole family to attend the trial,' and some rural school teachers brought their whole school to get a 'lesson in Civics,' all of which is not an infrequent or unusual occurrence in this county, and the jury was in no way disturbed or affected by their presence. The defendant received a fair and impartial trial before a fair and impartial jury, who had no knowledge or information by hearsay or otherwise of the facts or circumstances of the case before being selected as jurors, and the Court used extra precaution to and did

see that no fact or circumstances reached their sight or hearing that would be even calculated to effect them save the testimony upon the trial."

The case of Steagald v. State, 22 Texas App., 464., 3 S. W., 771, was reversed upon several grounds, among them, the use of prejudiced jurors, a faulty charge of the court, and the failure to grant the motion for new trial, the court stating that under the facts before it, the trial court was in error in failing to change the venue upon its own motion. The record that was before the court, and the action on the appeal exemplified the fact that in a proper case this court would exert its authority and order a new trial in a case where the death penalty is assessed, and it is·made manifest by the record that the right of the accused to a fair and impartial trial was denied.

A like ruling was properly made upon a similar record in the case of Massey v. State, 31 Texas Crim. Rep., 371, 20 S. W., 758. Each of these cases illustrate and emphasize the point that circumstances may be such as render it impossible for one accused of crime to seek a change of venue, or may be such as would imperil his life should he do so, and that this court would not be powerless to relieve against injustice.

·Faulkner's case, 80 Texas Crim. Rep., 341, 189 S. W., 1077, 1081, was reversed because of an improper ruling upon the evidence. Presiding Judge Davidson, speaking for the court, in very cogent and foreceful language, emphasized the authority to order a reversal where the trial was unfair. He said: "It occurs to the writer that to affirm the judgment on a record of this character would be sanctioning the mob spirit in the court room and depriving a man of a fair and just trial and without due process of law."

In the Liggon case, 82 Texas Crim. Rep., 514, 200 S. W., 530, a like ruling was made. Judge Davidson, writing the opinion, declared that by failing to apply for a change of venue the accused would not waive his guaranteed right to a fair trial where his failure to waive it would bring about his death at the hands of a mob.

In the Mickle case, 85 Texas Crim. Rep., 560, 213 S. W., 665, the opinion reversing the case was written by Judge Lattimore and is similar in its essence to those to which we have adverted above. However, all of them were upon a record variant from that at present under consideration.

In the present case, there was no effort for a delay. McKenzie v. State, 116 Texas Crim. Rep., 395, 11 S. W. (2d) 172. No complaint was made of the speedy manner in which the accused was put to trial. The witnesses called upon the motion for new trial negatived the presence of a mob and supported the claim that the presence of officers and the transfer of the accused to different counties were but precautionary measures rather than to forced action in fear of a mob. The mere fact that officers have found it expedient in time of excitement to remove one

accused of a capital crime to a place of safety in another county in order to discourage the mob spirit, or that they may (as claimed in the present case), have caused the presence of officers at the time of the trial to preserve order and prevent disturbances, standing alone, are not deemed sufficint predicate upon which this court may order a reversal of the judgment. The statement of the trial judge, in explanation of the bill of exception, puts before this court a state of facts parallel with none of those controlling the action on appeal in the cases to which reference has been made above. There is no exception to the statement of the judge qualifying the bill. The principles in the cases mentioned are sound and must continue to prevail as long as the spirit of justice survives, when it appears that the mob spirit may have perverted and deflected even the tenor of the due administration of law.

While, under the facts before it, this court feels unauthorized to reverse the judgment of conviction, still it must be conceded that the rapidity of the events which brought the appellant to trial and conviction, the conditions which invited his removal from place to place pending his arrest and arraignment, and the conditions which impelled extraordinary precaution against the formation of a mob, were such as might well have impelled the trial judge to change the venue on his own motion or to postpone the trial for a calmer setting. Of those who took part in the trial or of the many who were present and observed the proceedings, but two witnesses testified upon the hearing of the motion for new trial. Their testimony in the main combats the idea that either the trial judge or the jury was controlled by a mob. In exercising its power to annul a verdict upon the grounds set forth in the present appeal, this court, as above stated, is controlled by the evidence brought up in the record. In the executive department of the state there has been vested the authority to relieve against injustice. The Governor and the Board of Pardon Advisors are not restricted, as this court is, by the facts in the record. It is within their province to act upon information, affidavits or otherwise and thus inform themselves as to the merits of the questions before them. If they are facts such as would give serious reason for doubt of the fairness of the trial of the appellant, they are not in the record, and his remedy is not by appeal to this court.

None of the bills of exception taken to the rulings of the court upon the trial are such as to require or authorize reversal of the judgment. The fault in the charge to which attention was called in the original opinion is not deemed such as would authorize a reversal of the conviction.

The attention of the trial court was not called to the fault in the charge mentioned in the original opinion. Otherwise it would doubtless have been corrected. The sufficiency of the charge is questioned on appeal for the first time.

The accomplice witness was Bud Goodwin, a brother of the accused. He was likewise under indictment. His testimony connects the appellant with the theft of the hog which his father killed and also connects the appellant with the death of the deceased. Touching the connection of the appelant with the theft of the hog, and in many other particulars, Bud Goodwin is corroborated by the witness Sanders.

In the matter of showing the appellant's direct connection with the killing of Elliott, Bud Goodwin, the accomplice witness, is corroborated by the testimony of the appellant given on the trial of the case, in which he admitted his connection with the stolen hog. He also admitted the presence of Elliott about the premises shortly before he disappeared. In substance, the appellant's testimony is as follows: After taking the boat to the river and getting some fishing lines, he provided himself with two guns for the purpose of killing rabbits for bait. One of the guns was a rifle, the other was a shotgun. He then hid behind a tree in the thicket and looked for rabbits. Without warning to the appellant, Elliott appeared. From the appellant's testimony we quote: "When Lloyd Elliott rode up behind me he stopped, and told me to get my God damn hell out of those woods, and he ran his hand down in his bosom. I figured he was going to shoot me. I had this .410 shotgun in my hand and I dropped it and picked up the Winchester and shot him, and hit him here (indicating). I did not shoot him in the back and did not intend to. He ran around the tree then and I shot him in the back of the head. I was going around the tree when I shot him the last time, and he was going around the tree. He did not say anything else."

Appellant first hid the body by covering it with leaves, and later, with the aid of his brother, Bud Goodwin, put it in the river, where it was later found.

The deceased was shot three times,—twice with a rifle and once with a shotgun. One rifle shot entered the back and went through his body. Another entered the top of his head, and the third, with a shotgun, entered the head of the deceased. According to the testimony, the weapons were but a few feet from the victim when the shots were fired.

The motion for rehearing is overruled.

*Overruled.*